COPY

1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   DENNISE D. WILLETT
4  Assistant United States Attorney
   Chief, Santa Ana Branch Office
5  JOSHUA M. ROBBINS (Cal. Bar No. 270553)
   SCOTT D. TENLEY (Cal. Bar No. 298911)
6  Assistant United States Attorneys
   ASHWIN JANAKIRAM (Cal. Bar No. 277513)
7  Special Assistant United States Attorney
        8000 United States Courthouse
8       411 West Fourth Street
        Santa Ana, California 92701
9       Telephone: (714) 338-2829
        Facsimile: (714) 338-3561
10      E-mail:    scott.tenley@usdoj.gov

11 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

12

13                UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15                    SOUTHERN DIVISION

16 UNITED STATES OF AMERICA,        No. SA CR 16-

17            Plaintiff,            PLEA AGREEMENT FOR DEFENDANT
                                    MICHAEL E. BARRI
18            v.

19 MICHAEL E. BARRI,

20            Defendant.

21

22      1.   This constitutes the plea agreement between MICHAEL E.

23 BARRI ("defendant") and the United States Attorney's Office for the

24 Central District of California ("the USAO") in the above-captioned

25 case.  This agreement is limited to the USAO and cannot bind any

26 other federal, state, local, or foreign prosecuting, enforcement,

27 administrative, or regulatory authorities.

28

<u>DEFENDANT'S OBLIGATIONS</u>

2.    Defendant agrees to:

a.    Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a single-count information in the form attached to this agreement as Exhibit A, or a substantially similar form, which charges defendant with Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, all in violation of 18 U.S.C. § 371.

b.    Not contest facts agreed to in this agreement.

c.    Abide by all agreements regarding sentencing contained in this agreement.

d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.    Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g.    Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.    Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, the United States Postal Service

1  – Office of Inspector General, the Internal Revenue Service, and, as

2  directed by the USAO, any other federal, state, local, or foreign

3  prosecuting, enforcement, administrative, or regulatory authority.

4  This cooperation requires defendant to:

5          a.    Respond truthfully and completely to all questions

6  that may be put to defendant, whether in interviews, before a grand

7  jury, or at any trial or other court proceeding.

8          b.    Attend all meetings, grand jury sessions, trials or

9  other proceedings at which defendant's presence is requested by the

10 USAO or compelled by subpoena or court order.

11         c.    Produce voluntarily all documents, records, or other

12 tangible evidence relating to matters about which the USAO, or its

13 designee, inquires.

14     4.    For purposes of this agreement: (1) "Cooperation

15 Information" shall mean any statements made, or documents, records,

16 tangible evidence, or other information provided, by defendant

17 pursuant to defendant's cooperation under this agreement or pursuant

18 to the letter agreement previously entered into by the parties dated

19 December 14, 2015 (the "Letter Agreement"); and (2) "Plea

20 Information" shall mean any statements made by defendant, under oath,

21 at the guilty plea hearing and the agreed to factual basis statement

22 in this agreement.

23                          THE USAO'S OBLIGATIONS

24     5.    The USAO agrees to:

25         a.    Not contest facts agreed to in this agreement.

26         b.    Abide by all agreements regarding sentencing contained

27 in this agreement.

28

1         c.   At the time of sentencing, provided that defendant

2 demonstrates an acceptance of responsibility for the offense up to

3 and including the time of sentencing, recommend a two-level reduction

4 in the applicable Sentencing Guidelines offense level, pursuant to

5 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

6 additional one-level reduction if available under that section.

7         d.   Except for criminal tax violations (including

8 conspiracy to commit such violations chargeable under 18 U.S.C.

9 § 371), not further criminally prosecute defendant for violations

10 arising out of defendant's conduct described in the agreed-to factual

11 basis set forth in paragraph 18 below.  Defendant understands that

12 the USAO is free to criminally prosecute defendant for any other

13 unlawful past conduct or any unlawful conduct that occurs after the

14 date of this agreement.  Defendant agrees that at the time of

15 sentencing the Court may consider the uncharged conduct in

16 determining the applicable Sentencing Guidelines range, the propriety

17 and extent of any departure from that range, and the sentence to be

18 imposed after consideration of the Sentencing Guidelines and all

19 other relevant factors under 18 U.S.C. § 3553(a).

20         e.   With respect to the single count of the information,

21 recommend that defendant be sentenced to a term of imprisonment no

22 higher than the low end of the applicable Sentencing Guidelines

23 range, provided that the offense level used by the Court to determine

24 that range is 19 or higher and provided that the Court does not

25 depart downward in criminal history category.  For purposes of this

26 agreement, the low end of the Sentencing Guidelines range is that

27 defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A,

28 without regard to reductions in the term of imprisonment that may be

permissible through the substitution of community confinement or home detention as a result of the offense level falling within Zone B or Zone C of the Sentencing Table.

6.   The USAO further agrees:

a.   Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the probation office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the sentence to be imposed.

1        c.   In connection with defendant's sentencing, to bring to

2  the Court's attention the nature and extent of defendant's

3  cooperation.

4        d.   If the USAO determines, in its exclusive judgment,

5  that defendant has both complied with defendant's obligations under

6  paragraphs 2 and 3 above and provided substantial assistance to law

7  enforcement in the prosecution or investigation of another

8  ("substantial assistance"), to move the Court pursuant to U.S.S.G.

9  § 5K1.1 to fix an offense level and corresponding guideline range

10  below that otherwise dictated by the sentencing guidelines, and to

11  recommend a term of imprisonment at the low end of this reduced

12  range.

13           DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

14    7.  Defendant understands the following:

15        a.   Any knowingly false or misleading statement by

16  defendant will subject defendant to prosecution for false statement,

17  obstruction of justice, and perjury and will constitute a breach by

18  defendant of this agreement.

19        b.   Nothing in this agreement requires the USAO or any

20  other prosecuting, enforcement, administrative, or regulatory

21  authority to accept any cooperation or assistance that defendant may

22  offer, or to use it in any particular way.

23        c.   Defendant cannot withdraw defendant's guilty plea if

24  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

25  reduced guideline range or if the USAO makes such a motion and the

26  Court does not grant it or if the Court grants such a USAO motion but

27  elects to sentence above the reduced range.

28

1          d.    At this time the USAO makes no agreement or

2    representation as to whether any cooperation that defendant has

3    provided or intends to provide constitutes or will constitute

4    substantial assistance.   The decision whether defendant has provided

5    substantial assistance will rest solely within the exclusive judgment

6    of the USAO.

7          e.    The USAO's determination whether defendant has

8    provided substantial assistance will not depend in any way on whether

9    the government prevails at any trial or court hearing in which

10   defendant testifies or in which the government otherwise presents

11   information resulting from defendant's cooperation.

12                        NATURE OF THE OFFENSE

13   8.   Defendant understands that for defendant to be guilty of

14   the crime charged in the single count of the Information, that is,

15   Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, and

16   Engaging in Monetary Transactions in Property Derived from Specified

17   Unlawful Activity, all in violation of Title 18, United States Code,

18   Section 371, the following must be true:  (1) Beginning in or around

19   2009 and continuing through in or around October 2013, there was an

20   agreement between two or more persons to commit a violation of Title

21   18, United States Code, Sections 1341 and 1346 (Mail Fraud and Honest

22   Services Mail Fraud), and Title 18, United States Code, Section 1957

23   (Engaging in Monetary Transactions in Property Derived from Specified

24   Unlawful Activity); (2) defendant became a member of the conspiracy

25   knowing of at least one of its objects and intending to help

26   accomplish it; and (3) one of the members of the conspiracy performed

27   at least one overt act for the purpose of carrying out the

28   conspiracy.

9.  Defendant understands that Mail Fraud, in violation of Title 18, United States Code, Section 1341, has the following elements:  (1) the defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) the statements made or facts omitted as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

10.  Defendant further understands that Honest Services Mail Fraud, in violation of Title 18, United States Code, Section 1346, has the following elements:  (1) the defendant devised or participated in a scheme or plan to deprive a patient of his or her right to honest services; (2) the scheme or plan consisted of a bribe or kickback in exchange for medical services; (3) a medical professional person owed a fiduciary duty to the patient; (4) the defendant acted with the intent to defraud by depriving the patient of his or her right of honest services; (5) the defendant's act was material, that is, it had a natural tendency to influence, or was capable of influencing, a person's acts; and (6) the defendant used, or caused someone to use, the mails to carry out or attempt to carry out the scheme or plan.

11.  Defendant understands that Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957, has the following elements:  (1) the defendant knowingly engaged or attempted

8

to engage in a monetary transaction; (2) the defendant knew the
transaction involved criminally derived property; (3) the property
had a value greater than $10,000; (4) the property was, in fact,
derived from mail fraud; and (5) the transaction occurred in the
United States.

## PENALTIES AND RESTITUTION

12.   Defendant understands that the total statutory maximum
sentence that the Court can impose for a violation of Title 18,
United States Code, Section 371, is: 5 years imprisonment; a 3-year
period of supervised release; a fine of $250,000 or twice the gross
gain or gross loss resulting from the offense, whichever is greatest;
and a mandatory special assessment of $100.

13.   Defendant understands that defendant will be required to
pay full restitution to the victims of the offense to which defendant
is pleading guilty.  Defendant agrees that, in return for the USAO's
compliance with its obligations under this agreement, the Court may
order restitution to persons other than the victims of the offense to
which defendant is pleading guilty and in amounts greater than those
alleged in the count to which defendant is pleading guilty.   In
particular, defendant agrees that the Court may order restitution to
any victim of any of the following for any losses suffered by that
victim as a result:   any relevant conduct, as defined in U.S.S.G.
§ 1B1.3, in connection with the offense to which defendant is
pleading guilty.  The government currently believes that the
applicable amount of restitution is approximately $206,505, but
recognizes that this amount could change based on facts that come to
the attention of the parties prior to sentencing.

14.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

15.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

16.   Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The court cannot, and defendant's attorney also may not be able to, advise defendant

1    fully regarding the immigration consequences of the felony conviction

2    in this case.   Defendant understands that unexpected immigration

3    consequences will not serve as grounds to withdraw defendant's guilty

4    plea.

5                              FACTUAL BASIS

6         17.   Defendant admits that defendant is, in fact, guilty of the

7    offense to which defendant is agreeing to plead guilty.   Defendant

8    and the USAO agree to the statement of facts provided below and agree

9    that this statement of facts is sufficient to support a plea of

10   guilty to the charge described in this agreement and to establish the

11   Sentencing Guidelines factors set forth in paragraph 18 below but is

12   not meant to be a complete recitation of all facts relevant to the

13   underlying criminal conduct or all facts known to either party that

14   relate to that conduct.

15   **A.   Kickbacks for Referrals to Pacific Hospital**

16        Beginning in or around 2009 and continuing to in or around

17   October 2013, in Orange and Los Angeles Counties, within the Central

18   District of California, and elsewhere, defendant and Michael D.

19   Drobot ("Drobot"), together with other co-conspirators known and

20   unknown to the United States Attorney, knowingly combined, conspired,

21   and agreed to commit the following offenses against the United

22   States:   Mail Fraud and Honest Services Mail Fraud, in violation of

23   Title 18, United States Code, Sections 1341 and 1346, and Engaging in

24   Monetary Transactions in Property Derived from Specified Unlawful

25   Activity, in violation of Title 18, United States Code, Section 1957.

26        Specifically, beginning in 2009, defendant agreed to refer

27   workers' compensation patients, or to cause workers' compensation

28   patients to be referred, to Pacific Hospital of Long Beach ("Pacific

                                    11

1 Hospital"), owned and/or operated by Drobot, for spinal surgeries and

2 other medical services, in exchange for illegal kickbacks offered and

3 paid by Drobot and others through companies Drobot owned and/or

4 controlled.  Defendant, Drobot, and others concealed the kickbacks

5 from both defendant's patients and the insurance carriers that paid

6 for the services, and entered into bogus contracts under which

7 defendant purported to provide services to Drobot's companies to

8 justify the kickback payments.

9     Defendant, a licensed chiropractor, owned and operated Tri-Star

10 Medical Group ("Tri-Star"), a medical clinic located in Santa Ana,

11 California which specialized in treating workers' compensation

12 patients.  Defendant also owned, operated, and/or controlled Jojaso

13 Management Company, Inc. ("Jojaso"), a medical group management

14 company based in Santa Ana, California.

15     In 2009, Drobot solicited defendant to refer Tri-Star's workers'

16 compensation patients to Pacific Hospital for spinal surgeries and

17 other medical services in return for kickback payments.  Defendant

18 agreed.  In order to conceal the kickback payments defendant and

19 Drobot expected would be made, defendant, on behalf of Jojaso,

20 entered into an Outsourced Collection Agreement with Pacific

21 Hospital, effective April 17, 2009 (the "2009 Collection Agreement").

22 Under the terms of the 2009 Collection Agreement, Jojaso purported to

23 provide collection services to Pacific Hospital in return for a

24 payment of fifteen percent (15%) of any amount paid by insurance

25 carriers to Pacific Hospital for spinal surgeries referred by

26 defendant.  Neither defendant nor Drobot believed the 2009 Collection

27 Agreement was a legitimate contract for collection services; instead,

28

1  the 2009 Collection Agreement was merely a cover story to conceal the

2  planned kickback payments.

3       In 2011, after defendant did not cause any patients to be

4  referred to Pacific Hospital pursuant to the 2009 Collection

5  Agreement, Attorney A, on behalf of Pacific Hospital, solicited

6  defendant to enter into a new agreement under which defendant would

7  refer patients to Pacific Hospital in return for kickbacks.  In or

8  around June 2011, after meeting with Drobot and Attorney A, defendant

9  entered into a second Outsourced Collection Agreement with Pacific

10 Hospital (the "2011 Collection Agreement" and collectively with the

11 2009 Collection Agreement, the "Collection Agreements").  The terms

12 of the 2011 Collection Agreement mirrored the terms of the 2009

13 Collection Agreement, but also provided that Jojaso would be paid its

14 fifteen percent collection fee within sixty days of the surgery,

15 regardless of whether any monies had yet been paid to Pacific

16 Hospital by insurance carriers.  Shortly after entering into the 2011

17 Collection Agreement, Jojaso received a $10,000 payment from Pacific

18 Hospital as a "deposit" for agreeing to refer patients to Pacific

19 Hospital.  However, between July 2011 and February 2012, defendant

20 did not refer any patients to Pacific Hospital under the 2011

21 Collection Agreement.

22      In or around January 2012, at defendant's request, Drobot agreed

23 to increase the amount paid to Jojaso for patients defendant referred

24 to Pacific Hospital from fifteen percent to twenty-five percent

25 (25%).  Accordingly, on or about January 27, 2012, defendant and

26 Drobot amended the terms of the 2011 Collection Agreement to reflect

27 the increased kickback amount, while also removing the provision

28 requiring Pacific Hospital to make payments to defendant within sixty

13

days of surgery, regardless of whether any monies had actually been collected by Pacific Hospital. Defendant then began referring Tri-Star's workers' compensation patients to Pacific Hospital. Between November 2012 and July 2013, defendant received $158,555.98 in kickbacks in return for the referral of twelve patients to Pacific Hospital, which Pacific Hospital paid to defendant only after Pacific Hospital had collected from insurance carriers. Those surgeries were performed primarily by Surgeon A and Surgeon B, spinal surgeons who were affiliated with Tri-Star.

As defendant and Drobot knew, the Collection Agreements were bogus contracts designed to conceal the kickback payments made to defendant by Drobot. Jojaso performed and documented some limited collection-related activities on behalf of Pacific Hospital, but only for the purpose of creating an appearance that legitimate collection services had been provided.

In addition to kickback payments received pursuant to the Collection Agreement, defendant also received kickbacks from Drobot by means of a below-market rate lease of medical office space. On or about May 1, 2012, Jojaso entered into a sublease agreement with Pacific Hospital pursuant to which Jojaso subleased medical office space at 2609 Pacific Avenue, Suite 300, Long Beach, California (the "Pacific Avenue Office") for $2,000 per month (the "Sublease Agreement"). Pacific Hospital leased the Pacific Avenue Office for $5,162.50 per month. While defendant did not know the precise amount Pacific Hospital paid to lease the Pacific Avenue Office, defendant knew that the fair market value of the Pacific Avenue Office clearly exceeded $2,000 per month. Defendant further understood that Drobot entered into the Sublease Agreement at the below-market rate in

return for defendant's referral of workers' compensation patients to Pacific Hospital.  In total, between May 2012 and April 2013, defendant was not required to pay to Drobot $37,950 that would have otherwise been owed had the Sublease Agreement called for payment of market-rate rent.

In total, between 2009 and 2013, through the Collection Agreements and the Sublease Agreement, defendant received from Drobot, Pacific Hospital, and entities under Drobot's control, approximately $206,505.98 in return for defendant's referral of patients to Pacific Hospital for spinal surgeries and other medical services.  In turn, Pacific Hospital billed insurance carriers approximately $3.9 million for spinal surgeries and other medical services performed on patients referred to Pacific Hospital by defendant.

Defendant knew that it was illegal to accept the kickbacks discussed above.  Further, defendant knew that Pacific Hospital would submit claims by mail and electronically to workers' compensation insurance carriers for the services that resulted from the referrals induced by the payment of kickbacks; and defendant knew that Pacific Hospital would receive by mail payments from the workers' compensation insurance carrier as reimbursement for the claims. Defendant also knew that, if the insurance carriers had known that the spinal surgeries for which they were billed resulted from referrals induced by such kickbacks, those insurance carriers would not have paid the claims or would have paid a lesser amount. Moreover, defendant knew that, if his patients had known that he was receiving such kickbacks, they may have chosen not to obtain the

1  medical services recommended, or may have chosen to be treated by
2  different medical professionals or at a different hospital.
3      At all times during the conspiracy, defendant knew that his co-
4  conspirators would send various items through the mail in furtherance
5  of the conspiracy.
6      In furtherance of the conspiracy and to accomplish the objects
7  of the conspiracy, defendant and other co-conspirators committed
8  various overt acts within the Central District of California,
9  including but not limited to the following:
10      Overt Act No. 1
11      On or about April 17, 2009, defendant caused Jojaso to enter
12  into an Outsourced Collection Agreement with Pacific Hospital, under
13  which Jojaso would be paid fifteen percent of any monies collected by
14  Pacific Hospital on patients referred for surgery to Pacific Hospital
15  by defendant.
16      Overt Act No. 2
17      On July 13, 2009, defendant sent an email message to Drobot
18  inquiring about obtaining credentials for Surgeon C to perform spinal
19  surgeries at Pacific Hospital.
20      Overt Act No. 3
21      On or about June 14, 2011, defendant caused Jojaso to enter into
22  an Outsourced Collection Agreement with Pacific Hospital under which
23  Jojaso would be paid, within sixty days of surgery, fifteen percent
24  of any monies collected, or estimated to be collected, on patients
25  referred for surgery to Pacific Hospital by defendant.
26      Overt Act No. 4
27      On or about June 16, 2011, defendant sent an email message to
28  Drobot and Attorney A informing Drobot and Attorney A that the

16

1   surgery to be performed at Pacific Hospital on June 22, 2011 by
2   Surgeon D was the result of a referral by defendant.

3       Overt Act No. 5

4       On or about January 27, 2012, defendant caused Jojaso to enter
5   into Amendment One to Outsourced Collection Agreement, increasing the
6   collection fee paid to Jojaso to twenty-five percent of any monies
7   collected on patients referred for surgery to Pacific Hospital by
8   defendant.

9       Overt Act No. 6

10      On or about May 1, 2012, defendant caused Jojaso to enter into a
11  Medical Office Sublease with Pacific Hospital for the medical office
12  located at 2690 Pacific Avenue, Suite 300, Long Beach, California.

13      Overt Act No. 7

14      On or about June 11, 2012, defendant sent to Attorney A an
15  invoice purported to be for collection services performed by Jojaso
16  related to a spinal surgery performed on Patient A at Pacific
17  Hospital.

18      Overt Act No. 8

19      On or about November 28, 2012, Pacific Hospital sent to Jojaso a
20  check for $3,143 in connection with defendant's referral of Patient A
21  to Pacific Hospital for spinal surgery.

22      Overt Act No. 9

23      On or about May 29, 2013, Pacific Hospital sent to Jojaso a
24  check for $26,248.03.

25      Overt Act No. 10

26      On or about June 14, 2012, Pacific Hospital sent to Jojaso a
27  check for $20,036.89.

28

Overt Act No. 11

On or about July 2, 2013, Pacific Hospital sent to Jojaso a check for $25,613.93.

**B. Kickbacks for Referrals to Tri-City Medical Center**

Defendant also received kickback payments for referring workers' compensation patients to Tri-City Medical Center in Hawaiian Gardens, California ("Tri-City") for spinal surgeries and other medical procedures. Defendant was introduced to Executive A of Tri-City by Paul Randall, a health care marketer. Defendant and Executive A agreed that Tri-City would pay kickbacks to defendant in exchange for defendant's referrals to Tri-City. To facilitate the kickback arrangement, defendant entered into a collection agreement with Tri-City (the "Tri-City Collection Agreement") that called for defendant to be paid twelve and one-half percent (12.5%) of any amount collected for medical services provided to patients referred by defendant. Based on his conversation with Executive A, defendant knew that the Tri-City Collection Agreement, like the Collection Agreements later entered into with Drobot and Pacific Hospital, was a bogus contract, and that defendant was not required to perform legitimate collection activities in order to earn the purported collection fee and to be paid for referrals. When defendant first sought payment for referrals from Tri-City, however, Attorney B advised defendant that, in order for defendant to be paid for his referrals, defendant was required to create documentation designed to show that defendant performed some collection-related activities, even though the payment to defendant was for defendant's referrals. Defendant thereafter began maintaining documentation as instructed by Attorney B.

1    Pursuant to his agreement with Executive A, defendant referred

2  workers' compensation patients to Surgeon B, Surgeon C, and others

3  for surgeries to be performed at Tri-City.   In return for those

4  referrals, defendant received kickback payments from both Tri-City

5  and Randall.

6                              SENTENCING FACTORS

7    18.   Defendant understands that in determining defendant's

8  sentence the Court is required to calculate the applicable Sentencing

9  Guidelines range and to consider that range, possible departures

10 under the Sentencing Guidelines, and the other sentencing factors set

11 forth in 18 U.S.C. § 3553(a).  Defendant understands that the

12 Sentencing Guidelines are advisory only, that defendant cannot have

13 any expectation of receiving a sentence within the calculated

14 Sentencing Guidelines range, and that after considering the

15 Sentencing Guidelines and the other § 3553(a) factors, the Court will

16 be free to exercise its discretion to impose any sentence it finds

17 appropriate up to the maximum set by statute for the crime of

18 conviction.  Defendant and the USAO agree to the following applicable

19 Sentencing Guidelines factors:

20    Base Offense Level:      6   [U.S.S.G. § 2B1.1(a)(2)]

21    Specific Offense
      Characteristics:

22
      Loss between           +10   [U.S.S.G. § 2B1.1(b)(1)(F)]
23    $150,000-$250,000

24    Abuse of Trust         +2    [U.S.S.G. § 3B1.3]

25    Upward Departure:      +2    [U.S.S.G. § 5K2.0]

26 The USAO will agree to a two-level downward adjustment for acceptance

27 of responsibility (and, if applicable, move for an additional one-

28 level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the

conditions set forth in paragraph 5(c)) are met.  Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

19.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

20.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

21.  Defendant understands that by pleading guilty, defendant gives up the following rights:

    a.  The right to persist in a plea of not guilty.

    b.  The right to a speedy and public trial by jury.

    c.  The right to be represented by counsel - and if necessary have the court appoint counsel - at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel - and if necessary have the court appoint counsel - at every other stage of the proceeding.

    d.  The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

    e.  The right to confront and cross-examine witnesses against defendant.

    f.  The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

1    g.    The right not to be compelled to testify, and, if

2    defendant chose not to testify or present evidence, to have that

3    choice not be used against defendant.

4    h.    Any and all rights to pursue any affirmative defenses,

5    Fourth Amendment or Fifth Amendment claims, and other pretrial

6    motions that have been filed or could be filed.

### WAIVER OF APPEAL OF CONVICTION

22.    Defendant understands that, with the exception of an appeal
based on a claim that defendant's guilty plea was involuntary, by
pleading guilty defendant is waiving and giving up any right to
appeal defendant's conviction on the offense to which defendant is
pleading guilty.

### LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

23.    Defendant agrees that, provided the Court imposes a total
term of imprisonment on all counts of conviction of no more than the
low end of the Guidelines range corresponding to a total offense
level of 19 and defendant's criminal history category, defendant
gives up the right to appeal all of the following: (a) the procedures
and calculations used to determine and impose any portion of the
sentence; (b) the term of imprisonment imposed by the Court; (c) the
fine imposed by the court, provided it is within the statutory
maximum; (d) the amount and terms of any restitution order, provided
it requires payment of no more than $206,505; (e) the term of
probation or supervised release imposed by the Court, provided it is
within the statutory maximum; and (f) any of the following conditions
of probation or supervised release imposed by the Court: the
conditions set forth in General Orders 318, 01-05, and/or 05-02 of
this Court; the drug testing conditions mandated by 18 U.S.C.

§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

24.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than the low end of the Guidelines range corresponding to a total offense level of 19 and defendant's criminal history category, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the following: the amount of restitution ordered, if that amount is less than $206,505.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

25.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible.

## EFFECTIVE DATE OF AGREEMENT

26.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

27.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; and (ii) will no longer be bound by any agreement

regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

## COURT AND PROBATION OFFICE NOT PARTIES

28.   Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

29.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information

24

to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 20 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

30.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

31.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3            PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4       32.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10 EILEEN M. DECKER
   United States Attorney

11

12 _____          _1/21/16_____

13 SCOTT D. TENLEY                           Date
   Assistant United States Attorney

14 _____          _1/20/2016_____

15 MICHAEL E. BARRI                          Date
   Defendant

16 _____          _1/20/16_____

17 JESSICA C. MUNK                           Date
   Attorney for Defendant MICHAEL E.

18 BARRI

19

20

21

22                    CERTIFICATION OF DEFENDANT

23      I have read this agreement in its entirety.  I have had enough

24 time to review and consider this agreement, and I have carefully and

25 thoroughly discussed every part of it with my attorney.  I understand

26 the terms of this agreement, and I voluntarily agree to those terms.

27 I have discussed the evidence with my attorney, and my attorney has

28 advised me of my rights, of possible pretrial motions that might be

                                  26

1 filed, of possible defenses that might be asserted either prior to or

2 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

3 of relevant Sentencing Guidelines provisions, and of the consequences

4 of entering into this agreement.  No promises, inducements, or

5 representations of any kind have been made to me other than those

6 contained in this agreement.  No one has threatened or forced me in

7 any way to enter into this agreement.  I am satisfied with the

8 representation of my attorney in this matter, and I am pleading

9 guilty because I am guilty of the charges and wish to take advantage

10 of the promises set forth in this agreement, and not for any other

11 reason.

12 _____          1/20/2016

13 MICHAEL E. BARRI                           Date
   Defendant

14

15                  CERTIFICATION OF DEFENDANT'S ATTORNEY

16        I am MICHAEL E. BARRI's attorney.  I have carefully and

17 thoroughly discussed every part of this agreement with my client.

18 Further, I have fully advised my client of his rights, of possible

19 pretrial motions that might be filed, of possible defenses that might

20 be asserted either prior to or at trial, of the sentencing factors

21 set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

22 provisions, and of the consequences of entering into this agreement.

23 To my knowledge: no promises, inducements, or representations of any

24 kind have been made to my client other than those contained in this

25 agreement; no one has threatened or forced my client in any way to

26 enter into this agreement; my client's decision to enter into this

27 agreement is an informed and voluntary one; and the factual basis set

28

                                  27

1    forth in this agreement is sufficient to support my client's entry of

2    a guilty plea pursuant to this agreement.

3

4    _____          _____
     JESSICA C. MUNK                          Date  1/20/16
5    Attorney for Defendant MICHAEL E.
     BARRI

28

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>MICHAEL E. BARRI,<br><br>              Defendant. | SA CR No. 16-<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy] |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

1.   Healthsmart Pacific Inc., doing business as Pacific Hospital of Long Beach ("Pacific Hospital"), was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot") and Executive A.

2.    Defendant MICHAEL E. BARRI ("defendant BARRI") was a chiropractor who owned and operated Tri-Star Medical Group ("Tri-Star"), a medical clinic located in Santa Ana, California specializing in treating workers' compensation patients.

3.    Defendant BARRI also operated and controlled Jojaso Management Company, Inc. ("Jojaso"), a medical group management company based in Santa Ana, California.

4.    The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.  Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.  When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.  Claims were submitted to and paid by the insurance carriers either by mail or electronically.  The CWCS was governed by various California laws and regulations.

5.    The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, that provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employees without any other coverage.

6.    California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering,

31

soliciting, or receiving of anything of value in return for referring a patient for medical services.

7.    The Federal Employees' Compensation Act ("FECA") provided benefits to civilian employees of the United States, including United States Postal Service employees, for medical expenses and wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee.  Benefits available to injured employees included rehabilitation, medical, surgical, hospital, pharmaceutical, and supplies for treatment of an injury.  The Department of Labor ("DOL") – Office of Workers' Compensation Programs ("OWCP") was the governmental body responsible for administering the FECA.  When a federal employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment by mail or electronically to Affiliated Computer Services ("ACS"), located in London, Kentucky, which was contracted with the DOL to handle such claims.  Upon approval of the claim, ACS sent payment by mail or electronic funds transfer from the U.S. Treasury in Philadelphia, Pennsylvania, to the medical service provider.

8.    Federal law prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical services paid for by a federal health care benefit program.

B.    OBJECTS OF THE CONSPIRACY

9.    Beginning on a date unknown but at least as early as in or around 2009, and continuing through at least in or around April 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant BARRI and Drobot, together with

1  others known and unknown to the United States Attorney, knowingly

2  combined, conspired, and agreed to commit the following offenses

3  against the United States:  Mail Fraud and Honest Services Mail

4  Fraud, in violation of Title 18, United States Code, Sections 1341

5  and 1346; and Engaging in Monetary Transactions in Property Derived

6  from Specified Unlawful Activity, in violation of Title 18, United

7  States Code, Section 1957.

8  C.   MANNER AND MEANS OF THE CONSPIRACY

9       10.  The objects of the conspiracy were to be carried out, and

10  were carried out, in the following ways, among others:

11            a.   Drobot and other co-conspirators offered to pay

12  kickbacks to defendant BARRI and other doctors, chiropractors,

13  workers' compensation and personal injury attorneys, marketers, and

14  others in return for referring workers' compensation patients to

15  Pacific Hospital for spinal surgeries, other types of surgeries,

16  magnetic resonance imaging, toxicology, durable medical equipment,

17  and other services, to be paid through FECA and the CWCS.  For spinal

18  surgeries, typically, Drobot offered to pay a kickback of $15,000 per

19  lumbar fusion surgery and $10,000 per cervical fusion surgery,

20  provided that equipment distributed through International Implants

21  was used in the surgery.

22            b.   Influenced by the promise of kickbacks, defendant

23  BARRI and other doctors, chiropractors, workers' compensation and

24  personal injury attorneys, marketers, and others referred patients

25  insured through the CWCS and the FECA to Pacific Hospital for spinal

26  surgeries, other types of surgeries, and other medical services.  In

27  some cases, defendant BARRI and other doctors, chiropractors, or

28  others referred patients to spinal surgeons, who understood that the

referrals were conditioned on the spinal surgeons' performing the surgeries at Pacific Hospital.  The workers' compensation patients were not informed that the medical professionals had been offered kickbacks to induce them to refer the surgeries and other medical services to Pacific Hospital.  That information would have been material to those patients, to whom defendant BARRI and other doctors owed a fiduciary duty to disclose any financial conflicts of interest.

c.   The surgeries and other medical services were performed on the referred workers' compensation patients at Pacific Hospital.

d.   Pacific Hospital submitted claims, by mail and electronically, to SCIF and other workers' compensation insurance carriers for payment of the costs of the surgeries and other medical services.

e.   As defendant BARRI and the other co-conspirators knew and intended, and as was reasonably foreseeable to them, in submitting claims for payment, Pacific Hospital concealed material information from SCIF and other workers' compensation insurance carriers, including the fact that Pacific Hospital did not disclose to the insurance carriers that it had offered or paid kickbacks for the referral of the surgeries and other medical services for which it was submitting claims.

f.   The insurance carriers paid Pacific Hospital's claims, by mail or electronically.

g.   Drobot and others paid and caused others to pay kickbacks to defendant BARRI and other doctors, chiropractors,

34

1  marketers, and others who had referred patients to Pacific Hospital
2  for surgeries and other medical services.

3          h.    To conceal the nature of the kickback payments from
4  both workers' compensation insurance carriers and patients, Drobot,
5  through one of the companies he owned and/or operated, entered into
6  bogus contracts with the doctors, chiropractors, including defendant
7  BARRI, marketers, and others.  The services discussed in those
8  contracts were, in fact, generally not provided; rather, the
9  compensation paid was based on the number and type of surgeries and
10 other medical services referred to Pacific Hospital.  Defendant BARRI
11 and Drobot entered into the following bogus contracts in order to
12 hide the kickback payments:  a collections agreement and a lease
13 agreement.

14         i.    Drobot and others kept records of the number of
15 surgeries and other medical services performed at Pacific Hospital
16 due to referrals from the kickback recipients, as well as amounts
17 paid to the kickback recipients for those referrals.  Periodically,
18 Drobot and others amended the bogus contracts with the kickback
19 recipients to increase or decrease the amount of agreed compensation
20 described in the contracts, in order to match the amount of kickbacks
21 paid or promised in return for referrals.

22 D.   EFFECTS OF THE CONSPIRACY

23      11.  Had SCIF and the other workers' compensation insurance
24 carriers known the true facts regarding the payment of kickbacks for
25 the referral of workers' compensation patients for surgeries and
26 other medical services performed at Pacific Hospital, they would not
27 have paid the claims or would have paid a lesser amount.

28

12.   From 2005 to in or around April 2013, Pacific Hospital billed workers' compensation insurance carriers approximately $580 million in claims for spinal surgeries that were the result of the payment of a kickback; and Drobot and other co-conspirators paid kickback recipients between approximately $20 million and $50 million in kickbacks relating to those claims.

E.   OVERT ACTS

13.   On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant BARRI and other co-conspirators known and unknown to the United States Attorney, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On or about April 17, 2009, defendant BARRI caused Jojaso to enter into an Outsourced Collection Agreement with Pacific Hospital, under which Jojaso would be paid fifteen percent of any monies collected by Pacific Hospital on patients referred for surgery to Pacific Hospital by defendant BARRI.

Overt Act No. 2:   On July 13, 2009, defendant BARRI sent an email message to Drobot inquiring about obtaining credentials for Surgeon C to perform spinal surgeries at Pacific Hospital.

Overt Act No. 3:   On or about June 14, 2011, defendant BARRI caused Jojaso to enter into an Outsourced Collection Agreement with Pacific Hospital under which Jojaso would be paid, within sixty days of surgery, fifteen percent of any monies collected, or estimated to be collected, on patients referred for surgery to Pacific Hospital by defendant BARRI.

1    Overt Act No. 4:    On or about June 16, 2011, defendant BARRI

2  sent an email message to Drobot and Attorney A informing Drobot and

3  Attorney A that the surgery to be performed at Pacific Hospital on

4  June 22, 2011 by Surgeon D was the result of a referral by defendant

5  BARRI.

6    Overt Act No. 5:    On or about January 27, 2012, defendant

7  BARRI caused Jojaso to enter into Amendment One to Outsourced

8  Collection Agreement, increasing the collection fee paid to Jojaso to

9  twenty-five percent of any monies collected on patients referred for

10  surgery to Pacific Hospital by defendant BARRI.

11    Overt Act No. 6:    On or about May 1, 2012, defendant BARRI

12  caused Jojaso to enter into a Medical Office Sublease with Pacific

13  Hospital for the medical office located at 2690 Pacific Avenue, Suite

14  300, Long Beach, California.

15    Overt Act No. 7:    On or about June 11, 2012, defendant BARRI

16  sent to Attorney A an invoice purported to be for collection services

17  performed by Jojaso related to a spinal surgery performed on Patient

18  A at Pacific Hospital.

19    Overt Act No. 8:    On or about November 28, 2012, Pacific

20  Hospital sent to Jojaso a check for $3,143 in connection with

21  defendant BARRI's referral of Patient A to Pacific Hospital for

22  spinal surgery.

23    Overt Act No. 9:    On or about May 29, 2013, Pacific Hospital

24  sent to Jojaso a check for $26,248.03.

25    Overt Act No. 10:    On or about June 14, 2012, Pacific Hospital

26  sent to Jojaso a check for $20,036.89.

27  //

28  //

37

1     Overt Act No. 11:    On or about July 2, 2013, Pacific Hospital

2  sent to Jojaso a check for $25,613.93.

3

4                                    EILEEN M. DECKER
                                     United States Attorney
5

6

7                                    LAWRENCE S. MIDDLETON
                                     Assistant United States Attorney
8                                    Chief, Criminal Division

9                                    DENNISE D. WILLETT
                                     Assistant United States Attorney
10                                   Chief, Santa Ana Branch Office

11                                   JOSHUA M. ROBBINS
                                     SCOTT D. TENLEY
12                                   Assistant United States Attorneys

13                                   ASHWIN JANAKIRAM
                                     Special Assistant United States
14                                   Attorney

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Cristy Fillon, declare:

That I am a citizen of the United States and a resident of or employed in Orange County, California; that my business address is the Office of United States Attorney, 411 West 4th Street, Suite 8000, Santa Ana, California 92701; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction, on this date, **January 25, 2016**, I served a copy of the foregoing document(s):   **PLEA AGREEMENT**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☒ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows: **SEE ATTACHED**

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☐ By messenger, as follows:

☐ By Federal Express, as follows:

This Certificate is executed on **January 25, 2016**, in Santa Ana, California.   I certify under penalty of perjury that the foregoing is true and correct.

Cristy Fillon
Legal Assistant

<u>ATTACHMENT</u>

Jessica C. Munk

Senior Associate

Law Office of David W. Wiechert

115 Avenida Miramar

San Clemente, CA 92672